# In the United States Court of Federal Claims

No. 17-1865C
(E-Filed January 3, 2018)[1]

|  |  |  |
|---|---|---|
| TEAM WASTE GULF COAST, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | Bid Protest; Review of Small Business |
| | ) | Administration's Determination that |
| Defendant, | ) | Plaintiff Is Not a Small Business; |
| | ) | Preliminary Injunction Request. |
| and | ) | |
| | ) | |
| MARK DUNNING INDUSTRIES, INC., | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |
| | ) | |

Matthew T. Schoonover, Lawrence, KS, for plaintiff.  Steven J. Koprince, Candace M. Shields, Matthew P. Moriarty, and Ian P. Patterson, Lawrence, KS, of counsel.

David M. Kerr, Trial Attorney, with whom were Chad A. Readler, Principal Deputy Assistant Attorney General, Robert E. Kirschman, Jr., Director, Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Robert G. Palmer, Naval Facilities Engineering Command Southeast, Jacksonville, FL, of counsel.

Nicholas T. Solosky, Washington, DC, for intervenor-defendant.  Doug P. Hibshman, Washington, DC, of counsel.

---

[1]     This opinion was issued under seal on December 20, 2017.  The parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged.  Brackets ([ ]) identify the redacted portions of this opinion.

<u>OPINION AND ORDER</u>

CAMPBELL-SMITH, Judge.

This post-award bid protest is before the court on plaintiff's motion for a preliminary injunction, ECF No. 3. The court has before it plaintiff's memorandum, ECF No. 5, defendant's response brief, ECF No. 22, and plaintiff's reply, ECF No. 24, as well as the Administrative Record, ECF Nos. 13-3 through 13-6.[2] Oral argument was deemed unnecessary. For the reasons set forth below, plaintiff's motion is **DENIED**.

I.     Background

The procurement that underlies this protest is for solid waste collection services at a Department of the Navy facility in Gulfport, Mississippi. ECF No. 13-3 at 138. Team Waste Gulf Coast, LLC (Team Waste GC) is the incumbent contractor for these services, and continues to perform these services under a bridge contract due to expire on December 31, 2017. ECF No. 5 at 19; ECF No. 24 at 19. The awardee for these services must be a small business, because this procurement is a 100% set-aside for small businesses. ECF No. 13-3 at 138.

When the Navy announced that Team Waste GC was the apparently successful offeror for the follow-on contract, another offeror, Mark Dunning Industries, Inc. (MDI), lodged a size protest with the Small Business Administration (SBA), alleging that Team Waste GC was not a small business. <u>Id.</u> at 8-9. The SBA determined that Team Waste GC was not a small business, due to its affiliation with Triangle Capital Corporation (Triangle). ECF No. 13-6 at 235-37. Team Waste GC appealed that determination to the SBA's Office of Hearings and Appeals (OHA). <u>Id.</u> at 205. OHA denied that appeal on November 6, 2017. <u>Id.</u> at 240, 248.

On November 13, 2017, Team Waste GC filed a pre-filing notice with this court for a bid protest it intended to file "on or after November 13, 2017." Pl.'s Pre-Filing Notification at 1. On November 30, 2017, the Navy awarded the solid waste collection contract to MDI. ECF No. 22 at 9. The next day, December 1, 2017, Team Waste GC filed its bid protest complaint in this court, and MDI intervened. At the initial scheduling conference held by the court, the parties informed the court that transition activities between Team Waste GC and MDI had already begun, and therefore proposed a schedule that required a ruling by December 20, 2017 on plaintiff's request for a preliminary injunction of contract performance. The court adopted the parties' expedited schedule.

The court turns first to the legal framework governing this type of bid protest. The court then presents its analysis of the OHA decision which confirmed that, in the SBA's

<hr />

[2]     All document references and page citations are to the electronic record preserved in the court's Case Management/Electronic Case Files (CM/ECF) system.

view, Team Waste GC does not meet the size standard for this procurement.  The court then briefly addresses the injunctive relief factors that deny plaintiff its requested preliminary injunction.

II.     Legal Standards

A.     Bid Protest Standard of Review

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2012)]:  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure.  Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  "The arbitrary and capricious standard applicable [in bid protests] is highly deferential."  Advanced Data Concepts, 216 F.3d at 1058.

De minimis errors in the procurement process do not justify relief.  Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing Andersen Consulting v. United States, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)).  The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question.  Id. (citing CACI Field Servs., Inc. v. United States, 854 F.2d 464, 466 (Fed. Cir. 1988)).  Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)) (alteration in original).  The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) (citation omitted).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"  Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

B.     Review of Decisions Rendered by SBA's Office of Hearings and Appeals (OHA)

This court may review a decision of the SBA when that decision constitutes an action "in connection with a procurement."  28 U.S.C. § 1491(b)(1) (2012); Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1254 (Fed. Cir. 2015).  "In reviewing the [SBA's] determination, special deference is given because of the SBA's 'quasi-technical administrative expertise and [its] familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme.'"  LB & B Assocs. Inc. v. United States, 68 Fed. Cl. 765, 771 (2005) (quoting Ceres Envtl. Servs., Inc. v. United States, 52 Fed. Cl. 23, 33 (2002)); see also Palladian Partners, 783 F.3d at 1259 (recognizing SBA-OHA's expertise).  Indeed, the "SBA is the best interpreter of its own regulations."  Mark Dunning Indus., Inc. v. United States, 58 Fed. Cl. 216, 225 (2003) (citing Lyng v. Payne, 476 U.S. 926, 939 (1986); Udall v. Tallman, 380 U.S. 1, 16 (1965)).  Reversal is limited to those situations where OHA has acted irrationally or has erroneously applied relevant procurement law.  Eagle Design & Mgmt., Inc. v. United States, 57 Fed. Cl. 271, 273 (2002).

C.     Injunctive Relief

As the Federal Circuit has held:

> In deciding whether a permanent injunction should issue, a court considers:  (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)).  The standard for a preliminary injunction is the same, except that likelihood of success on the merits, instead of actual success on the merits, must be shown by the plaintiff.  Id. at 1229.

III.    Analysis

The focus of this dispute is quite narrow.  The SBA found that one of the indirect owners of Team Waste GC, Energy Hardware Holdings, Inc. (Energy HH), had "powerful voting rights" pursuant to a foundational agreement governing the operations of Team Waste GC and related entities.  ECF No. 13-6 at 234.  Because these voting rights, along with Energy HH's ownership share in a parent entity of Team Waste GC, conferred sufficient control of Team Waste GC to Energy HH, Team Waste GC and Energy HH were affiliates, for the purpose of determining Team Waste GC's size.

4

Further, because Energy HH was 100% owned by Triangle, Triangle and Team Waste GC were also affiliated, through Energy HH. Moreover, because Triangle, on average, has annual receipts of over $100 million, Team Waste GC and its affiliated entities exceeded the $38.5 million annual receipts threshold for small businesses eligible for the follow-on contract. Id. at 232-33, 237. Plaintiff disputes the SBA's analysis of affiliation, especially as to the significance of the voting rights held by Energy HH.

A.      Plaintiff's Waiver of an Argument Not Presented to OHA

Many of plaintiff's arguments before OHA were essentially the same as those raised in this protest. For this reason, the court will not give a detailed account of Team Waste GC's appeal before OHA. Defendant, however, argues that plaintiff's failure to raise a particular argument in its OHA appeal waives that argument in its motion requesting a preliminary injunction from this court. ECF No. 22 at 19-20. The government's argument is sound.

Plaintiff never argued before OHA that two decisions issued by this court contradicted the SBA's size determination in this case. Compare ECF No. 5 at 12, 18-19 (citing Veterans Contracting Group, Inc. v. United States, 133 Fed. Cl. 613 (2017) (Veterans CG) & Miles Constr., LLC v. United States, 108 Fed. Cl. 792 (2013) (Miles), with ECF No. 13-6 at 205-24. Briefly stated, plaintiff now contends that this court has held in Veterans CG and Miles that certain "customary business provisions" used to protect "minority investor[s]" do not constitute control so as to trigger affiliation in the context of a business size determination. ECF No. 5 at 12, 17-19.

Although Veterans CG did not issue until after Team Waste GC filed its size appeal with OHA, Miles issued in 2013 and clearly established the test which plaintiff urges this court to apply in this case. Even if the court agreed with plaintiff that the holdings of Veterans CG and Miles are applicable here, which it does not, see infra, plaintiff's failure to raise any argument based on Miles before OHA waives this argument in the subject matter.

The court's task in this bid protest is to review OHA's action under the arbitrary and capricious standard. By its failure to raise the Miles argument before OHA, plaintiff has deprived OHA, in the first instance, of a chance to construe its own size determination regulations in light of the authority of Miles. Further, this court now has no OHA action responding to such an argument to review. Plaintiff's litigation strategy, whether inadvertent or calculated, now raises a supplemental ground for protest regarding which there is no underlying agency action for this court to review. Given the unique expertise of the SBA, the court believes that this type of bid protest is compromised when new arguments, not presented to OHA, are introduced for the first time to this court and regarding which there is no administrative action to review.

In sum, plaintiff's arguments based on <u>Veterans CG</u> and <u>Miles</u> have been waived. The doctrine of administrative exhaustion discussed in <u>Palladian Partners</u> provides further support for the application of waiver here.  The plaintiff in <u>Palladian Partners</u> had ignored a proceeding before the SBA which provided the sole opportunity for review of the North American Industry Classification System (NAICS) code applicable to a procurement for which Palladian was a prospective bidder.

The Federal Circuit first held that any interested party, such as Palladian, was required to protect its interest in the first NAICS code protest because any future protests of NAICS codes would be barred for failure to exhaust administrative remedies. <u>Palladian Partners</u>, 783 F.3d at 1257-58.  Palladian argued that a failure to exhaust administrative remedies is sometimes excused.  The Federal Circuit disagreed with Palladian's contentions, holding that Palladian's failure to exhaust its remedies at the SBA could not be excused, and repeatedly emphasized that the SBA has special expertise which must be applied to such controversies before a protestor turns to this court for relief.  <u>Id.</u> at 1258-60.

The Federal Circuit noted, in addition, that Palladian raised entirely new arguments and additional evidence in its bid protest before the Court of Federal Claims that OHA had never been given the opportunity to consider.  <u>Id.</u> at 1261.  The consequence of that failure could not be excused:

> Palladian's failure to present this argument in the pending OHA appeal deprived the agency of "an opportunity to correct its own errors, to afford the parties and the court the benefit of its experience and expertise, and to compile a record which is adequate for judicial review."

<u>Id.</u> (quoting <u>Weinberger v. Salfi</u>, 422 U.S. 749, 765 (1975)).  As in <u>Palladian Partners</u>, Team Waste GC deprived OHA of the opportunity to address plaintiff's arguments based on this court's holding in <u>Miles</u>, and that failure cannot be excused.  Plaintiff's arguments based on <u>Veterans CG</u> and <u>Miles</u> have been waived.

B.     Control and Affiliation, in General

The size determination in this instance is generally governed by 13 C.F.R. § 121.103(a) (2017) ("<u>General Principles of Affiliation</u>").  First, "[c]oncerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both.  It does not matter whether control is exercised, so long as the power to control exists."  <u>Id.</u> § 121.103(a)(1).  Second, "[c]ontrol may be affirmative or negative.  Negative control includes, but is not limited to, instances where a minority shareholder has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders."  <u>Id.</u> § 121.103(a)(3).  Third, "[i]n determining

whether affiliation exists, SBA will consider the totality of the circumstances, and may find affiliation even though no single factor is sufficient to constitute affiliation." Id. § 121.103(a)(5).

More particularly, the affiliation and control issue here is directly addressed by the regulations titled "Affiliation based on stock ownership," 13 C.F.R. § 121.103(c) (2017). First, "[a] person (including any individual, concern or other entity) that owns, or has the power to control, 50 percent or more of a concern's voting stock, or a block of voting stock which is large compared to other outstanding blocks of voting stock, controls or has the power to control the concern." Id. § 121.103(c)(1). Second, "[i]f two or more persons (including any individual, concern or other entity) each owns, controls, or has the power to control less than 50 percent of a concern's voting stock, and such minority holdings are equal or approximately equal in size, and the aggregate of these minority holdings is large as compared with any other stock holding, SBA presumes that each such person controls or has the power to control the concern whose size is at issue. This presumption may be rebutted by a showing that such control or power to control does not in fact exist." Id. § 121.103(c)(2).

Although other types of affiliation were in play in the SBA's size determination, the dispositive issue in this protest is governed by the stock ownership regulations and general rules of affiliation cited here.

C.     Ownership and Control of Team Waste GC

The field of battle concerning stock ownership is not actually at Team Waste GC's level, but two levels higher up in a chain of wholly-owned subsidiaries. The pertinent entity is Team Waste, LLC, which is owned by Team Waste Holdings II, LLC (49.88%), Energy HH (49.88%), and four employees who each own non-voting shares of no real significance here. ECF No. 13-6 at 241. In essence then, Team Waste, LLC is equally owned by two entities, Team Waste Holdings II, LLC and Energy HH. Under the regulations cited above, there is no real dispute that Energy HH is presumed to control Team Waste, LLC (and, thus, Team Waste GC), although that presumption is rebuttable. 13 C.F.R. § 121.103(c)(2). The relevant date for the size determination is May 10, 2017, when Team Waste GC submitted its offer which included a certification that it met the size standard for this procurement. ECF No. 13-6 at 233, 236-37.

The equal ownership of Team Waste, LLC is expressed through the Third Amended and Restated Limited Liability Company Agreement (Operating Agreement) attached to plaintiff's memorandum, ECF No. 5 at 30-94, and various partial amendments to that overall Operating Agreement.[3] As of May 10, 2017, the Fifth Amendment to the

---

[3]     Plaintiff asserts that there is no evidence that OHA had the full Operating Agreement before it, because this document was not included in the Administrative Record filed with the court. ECF No. 24 at 7-9. Plaintiff further argues that this

Operating Agreement was in effect.  ECF No. 13-5 at 41-45.  According to this Fifth Amendment submitted by Team Waste GC to the SBA, by April 18, 2017 Energy HH had provided [ ] in capital contributions to Team Waste, LLC, whereas Team Waste Holdings II, LLC had provided [ ] in capital contributions.  Id. at 43-44.  Their respective stock ownership units, however, were [ ].  Team Waste Holdings II, LLC held [ ] "common units"; Energy HH held [ ] "preferred units."  Id. at 43.  According to the Fifth Amendment, at this point in time Team Waste Holdings II, LLC held 50% of "Common/Preferred Percentage Interests," as did Energy HH.  Thus, the ownership structure of Team Waste, LLC, as presented in the Operating Agreement, generally supports the SBA's finding, pursuant to 13 C.F.R. § 121.103(c)(2), that Energy HH controlled Team Waste, LLC.

It appears to be undisputed that four of the five board members of Team Waste, LLC are appointed by Team Waste Holdings II, LLC, and serve at the pleasure of [ ], the CEO of Team Waste, LLC (and other related companies).  ECF No. 5 at 6; ECF No. 13-5 at 203-04.  The fifth board member is appointed by Energy HH.  ECF No. 13-6 at 208.  Each board member has one vote.  See ECF No. 5 at 63 (Operating Agreement Subsection 6.2(c)).  Thus, excepting powers specially reserved to Energy HH by the Operating Agreement, Team Waste Holdings II, LLC generally leads Team Waste, LLC through its board.

The dispute, then, is whether the powers specially reserved by the Operating Agreement to Energy HH, through its unique position as the holder of [ ] preferred units, constitute control through stock ownership as defined by 13 C.F.R. § 121.103(a)(3):

> Negative control includes, but is not limited to, instances where a minority shareholder has the ability, under the concern's charter, by-laws, or shareholder's agreement, to

---

documentary flaw impugns the validity of OHA's decision in this matter.  Id.  The court disagrees.

The Administrative Record contains obvious gaps.  For example, MDI's brief submitted to OHA, extensively cited by OHA in its decision, ECF No. 13-6 at 245, is also not in the Administrative Record.  Plaintiff concedes that the full Operating Agreement was submitted to the SBA.  ECF No. 24 at 7.  Plaintiff's speculation that OHA did not review the full Operating Agreement is not supported by OHA's rational interpretation of that document.  Further, Team Waste GC's appeal to OHA, and this bid protest, focus narrowly on the negative control issue, for which OHA cited the relevant provisions of the Operating Agreement.  The rationality of OHA's decision is not impaired by the cited gap in the Administrative Record.

> prevent a quorum or otherwise block action by the board of
> directors or shareholders.

Id.  The court does not approach this dispute de novo.  Its review is constrained by the
arbitrary and capricious standard, and defers to the special expertise of the SBA in
construing its own regulations.

> D.      A Rational Reading of the Operating Agreement Establishes Negative
>         Control by Energy HH

As a threshold matter, the SBA found that Energy HH has voting rights, despite
plaintiff's protestations to the contrary.  ECF No. 13-6 at 234.  This finding is supported
by the Operating Agreement.  See ECF No. 5 at 62 ("Each Member shall vote all of his,
her or its Units . . . .").  Those voting rights, accorded Energy HH because it holds [ ]
preferred units, underlie the dispute over the control of Team Waste, LLC, although the
control most specifically discussed by the SBA is found in another section of the
Operating Agreement.

The SBA, in its initial size determination, and then OHA in the size appeal,
focused narrowly on "Investor Approval Rights," Section 6.5 of the Operating
Agreement.  ECF No. 5 at 65-67.  The court agrees with OHA that this section of the
Operating Agreement gives sufficient negative control to Energy HH to trigger affiliation
under the SBA's regulations cited supra.  There are fifteen discrete actions that Team
Waste, LLC (and Team Waste GC) cannot take without the consent of Energy HH.  See
ECF No. 5 at 65-66 (Subsections 6.5(a)-(o)).  Of these fifteen actions, seven are potential
triggers for a forced sale of Energy HH's units back to Team Waste, LLC, the "Call
Option," should Energy HH attempt to block said actions.  See id. at 77 (Section 8.7).
OHA therefore did not extensively rely on those subsections of Section 6.5, namely
Subsections 6.5(g)-(j) and (l)-(n), in its findings regarding Energy HH's negative control
of Team Waste, LLC.

There remain, however, eight specific types of actions which require the consent
of Energy HH and for which no Call Option limits Energy HH's power.  Some of these
company actions are extraordinary in nature, such as the dissolution of the company,
Subsection 6.5(o), or the amendment of the Operating Agreement so as to limit the rights
of Energy HH, Subsection 6.5(a).  ECF No. 5 at 65-66.  The power to block extraordinary
action, which is of the nature of investment-protection, must be distinguished from the
"power [to] block ordinary actions essential to operating a company," which constitutes
negative control.  ECF No. 13-6 at 246.

The SBA in its initial size determination, and OHA on appeal, paid particular
attention to three company actions that could be blocked by Energy HH, and cited these
as "examples" of negative control established by Section 6.5 of the Operating Agreement.
ECF No. 13-6 at 235.  These may not be the only company actions, as set forth in Section

6.5 of the Operating Agreement, over which Energy HH has negative control, but the court agrees that these three provisions are sufficient to create control and affiliation in the instant case.  The court will address each provision in turn.

1.    Payment of Distributions (Dividends)

Subsection 6.5(b) of the Operating Agreement generally prevents the company from making distributions, or, in other words, from paying dividends, to the members of the company without the consent of Energy HH.  ECF No. 5 at 65.  There is some dispute as to the significance of the statement of a dollar threshold related to the company's liquidity.  See ECF No. 24 at 13-14.  The court agrees with defendant's interpretation of the provision.  ECF No. 22 at 14-15.  The company can only make distributions without Energy HH's consent in two excepted circumstances, if the company's liquidity exceeds $2,500,000 after the distributions have been paid.  See ECF No. 5 at 65 (stating that the company may make unconsented distributions in two excepted circumstances "provided, that, Liquidity on the date of any Distribution, after taking into account such Distribution, is greater than $2,500,00").

Although OHA interpreted the dollar threshold differently, both OHA and defendant have cited persuasive SBA authority that considers the ability to block the payment of dividends to constitute negative control of a company, at least in certain circumstances.  ECF No. 13-6 at 247; ECF No. 22 at 13.  The court agrees with these authorities and finds that the Operating Agreement, Subsection 6.5(b), can reasonably be read to confer negative control to Energy HH.

In Eagle Pharmaceuticals, Inc., SBA No. SIZ-5023 (Jan. 23, 2009), for example, OHA examined the issues of investment-protection, negative control, and whether the payment of dividends is an ordinary business activity.  OHA specifically distinguished EA Engineering, Science, & Technology, Inc., SBA No. SIZ-4973 (July 14, 2008), a decision upon which plaintiff extensively relies.  See ECF No. 5 at 16-17; ECF No. 24 at 17-18.  OHA held that negative control had been established in Eagle Pharmaceuticals, in part due to a minority investor's power to block the payment of dividends.

As in the decisions cited by OHA, Energy HH, an investor in Team Waste GC, possesses negative control over the payment of distributions.  Team Waste GC is thus affiliated through Energy HH with Triangle, and is not a small business eligible for the procurement.  The OHA decision was rational in this regard.

2.    Termination of CEO Carter or Compensating Him above Agreed Levels

Subsection 6.5(e) of the Operating Agreement prevents the company from terminating its CEO [ ] or increasing his compensation above the annual amounts set forth in an Employment Agreement dated June 1, 2015 without the consent of Energy

HH.  ECF No. 5 at 39, 65.  OHA noted that SBA size determinations have held that the ability to block an executive's removal or changes to the executive's compensation is a form of negative control.  ECF No. 13-6 at 247.  The court finds these cited authorities to be persuasive.  As defendant notes, it was not irrational for OHA to find that Energy HH's power in this instance "crosses the line" from investment-protection to negative control.  ECF No. 22 at 17.

In Firewatch Contracting of Florida, LLC, SBA No. SIZ-4994 (Sept. 8, 2008), for example, OHA described how a company's operating agreement provided that a minority shareholder could block decisions on the hiring, firing and compensation of the officers of the company.  Again, OHA specifically distinguished EA Engineering, and noted that the "identification of the kind of power that constitutes negative control has been the subject of development over many years by OHA."  SBA No. SIZ-4994.  In Firewatch, the ability of an investor to block changes to executive compensation and the company's hiring and firing of those executives was sufficient to establish negative control.  The court finds that the Team Waste, LLC's Operating Agreement, Subsection 6.5(e), can reasonably be read to confer negative control to Energy HH, under OHA precedent interpreting SBA regulations.  The OHA decision reviewed here was not irrational in this regard.

3.      Any Change in Strategic Direction or Lines of Business

Subsection 6.5(f) of the Operating Agreement prevents the company from "effect[ing] any changes in the strategic direction or lines of business of the Company's landfill, waste hauling and related businesses" without the consent of Energy HH.  ECF No. 5 at 65.  Although plaintiff characterizes this power as Energy HH's ability to "prevent Team Waste from blazing an unforeseen, reckless path," ECF No. 5 at 17, OHA reasonably concluded that Energy HH could block innovation in the company's fundamental business operations, ECF No. 13-6 at 247.  It is true that veto power over substantial changes in lines of business did not rise to the level of negative control, in EA Engineering, particularly, but the broad power to block "any changes in the [company's] strategic direction" in the Operating Agreement offered Energy HH negative control over Team Waste, LLC.  ECF No. 13-6 at 247.

OHA's interpretation of Subsection 6.5(f) is reasonable, as is its interpretation of its own precedent.  Plaintiff condemns OHA for failing to counter the precedent of EA Engineering with other OHA precedent.  See ECF No. 5 at 17 (stating that OHA "ignore[d] the clear weight of authority established by EA Engineering").  It is clear to the court, however, that OHA has the power to distinguish the ruling in EA Engineering in other appeals, where appropriate, such as in Eagle Pharmaceuticals and Firewatch. Because OHA has rationally found that the Operating Agreement allowed Energy HH to block essential, ordinary business operations, and thus gave Energy HH negative control over Team Waste GC, OHA's decision must be sustained on this ground as well. Because there were three types of negative control afforded Energy HH by the Operating

Agreement, and because of the affiliation between Triangle and Team Waste GC, OHA rationally found that Team Waste GC did not meet the size standard for this procurement.

E.     The Test Applied in Veterans CG and Miles Is Not Sufficiently Analogous to the Size Determination Here

Finally, the court turns to plaintiff's reliance on Veterans CG and Miles.  Miles examined whether "unconditional ownership" required by 38 C.F.R. § 74.3 was not present due to a "right of first refusal" provision in a company agreement.  108 Fed. Cl. at 802-03.  The court in Miles thus interpreted a different type of provision in a company agreement, as well as different regulatory language in an entirely different set-aside program, than the regulation and circumstances at issue in this case.  Miles is therefore not sufficiently analogous to be considered here.

Veterans CG is also far afield from the issues in this case.  The court interpreted, relying in part on Miles, a "first opportunity to purchase" provision in a company agreement through the lens of the "unconditional ownership" requirement in 13 C.F.R. § 125.12.  Veterans CG, 133 Fed. Cl. at 620-22.  The court in Veterans CG thus interpreted a different type of provision in a company agreement, as well as different regulatory language in an entirely different set-aside program, than the regulation and circumstances at issue in this case.  Veterans CG is therefore not sufficiently analogous to be considered here.  Even if plaintiff had not waived any argument based on this line of precedent, there is nothing in Miles or Veterans CG which would invalidate the OHA decision under review here.

F.     Preliminary Injunctive Relief Not Warranted

Plaintiff has not shown likelihood of success on the merits of its protest.  This weighs heavily against the issuance of a preliminary injunction.  See, e.g., FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993) ("Absent a showing that a movant is likely to succeed on the merits, we question whether the movant can ever be entitled to a preliminary injunction unless some extraordinary injury or strong public interest is also shown.").  Indeed, the Federal Circuit has held that a failure to show likelihood of success on the merits is dispositive.  See Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir. 2004) (stating that "a movant is not entitled to a preliminary injunction if he fails to demonstrate a likelihood of success on the merits") (citation and footnote omitted).  The court briefly discusses the other injunctive relief factors.

The court does not see how the public interest would be served by delaying this procurement so that the Navy could re-examine its award decision, where Team Waste GC was reasonably removed from eligibility by OHA.  See Wind Tower Trade Coal. v. United States, 741 F.3d 89, 101 (Fed. Cir. 2014) (agreeing with the lower court that "no strong public interest [in the issuance of a preliminary injunction] was demonstrated" in that case when the movant had failed to show likelihood of success on the merits).

Further, irreparable harm to plaintiff is not established because the protestor has not shown likelihood of success on the merits.  See Akal Sec., Inc. v. United States, 87 Fed. Cl. 311, 319-20 (2009) (stating that the "strength or weakness of [the protestor's] merits arguments largely determines the court's view of irreparable injury").

Finally, there is more harm to the Navy flowing from an injunction of contract performance than there is to plaintiff in the absence an injunction, where plaintiff has not shown likelihood of success on the merits.  The Navy faces the financial consequences of the cost of an extended transition to a new contractor.  ECF No. 22 at 23.  Plaintiff's renewed attack on OHA's decision in this court, which has been shown to be unlikely to prevail, would merely buy plaintiff additional time before Team Waste GC would likely, again, be ruled ineligible for contract award.  Thus, only very limited economic harm could be avoided by a preliminary injunction.  The court notes, too, that plaintiff delayed the filing of its protest; this delay weighs in favor of the government on the balance of hardships factor.  See Aircraft Charter Sols., Inc. v. United States, 109 Fed. Cl. 398, 417 (2013) ("This court has repeatedly held that a protestor's delay in bringing a protest must be accounted for in the balance of hardships inquiry.") (citations omitted).  When all four of the injunctive relief factors are considered, plaintiff's request for a preliminary injunction must be denied.

IV.   Conclusion

Accordingly, plaintiff's motion for a preliminary injunction, ECF No. 3, is **DENIED**.  On or before **January 11, 2018**, the parties shall **CONFER** and **FILE** a **Proposed Redacted Version** of this opinion, with any competition-sensitive or otherwise protectable information blacked out and enclosed in brackets.  Also on or before **January 11, 2018**, the parties shall **CONFER** and **FILE** a **Joint Status Report** proposing a schedule for further proceedings in this matter.

IT IS SO ORDERED.

s/ Patricia Campbell-Smith
PATRICIA CAMPBELL-SMITH
Judge